Filed 7/29/21  P. v. Benson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN RYAN BENSON,<br><br>Defendant and Appellant. | C090165<br><br>(Super. Ct. No. 17FE012449) |

A jury found defendant Justin Ryan Benson guilty of committing multiple sex offenses against his daughter, D.D., including four counts of committing a lewd and lascivious act on a child under the age of 14 years (Pen. Code, § 288 subd. (a)), and two counts of committing an aggravated lewd and lascivious act on a child under the age of 14 years (*id*., § 288, subd. (b)(1)).  The trial court sentenced him to an aggregate term of 28 years in prison, and he timely appealed.

1

Defendant contends reversal is required due to evidentiary error and sentencing error. He alternatively argues that if none of the asserted errors merits reversal on its own, the cumulative effect of these alleged error and others was prejudicial and requires reversal. Finally, defendant requests we independently review (1) confidential school and medical records pertaining to D.D. to determine whether the trial court erred in failing to disclose any records material to the defense, and (2) confidential juvenile records pertaining to defendant to determine whether they contain any evidence that might be helpful to the defense on appeal. In a supplemental brief, defendant contends he is entitled to the ameliorative benefits of Assembly Bill No. 1869 (2019-2020 Reg. Sess.), which was enacted to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and . . . all outstanding debt incurred as a result of the imposition of administrative fees." (Stats. 2020, ch. 92, § 2.)

We have reviewed D.D.'s confidential records and conclude that the undisclosed information was not material to the defense. We decline defendant's invitation to review his confidential juvenile court records for reasons we explain *post*. We conclude that defendant is entitled to the ameliorative benefits of Assembly Bill No. 1869 and strike the administrative fees at issue. Because we find no merit in defendant's remaining claims, we affirm the judgment in all other respects.

## BACKGROUND

Over the course of a six-month period in late 2016 and early 2017, defendant repeatedly molested his daughter, D.D., at the family home. The molestation began on election night in November 2016 when D.D. was 12 years old.[1] During this incident, defendant pulled D.D. onto her back while she was watching television on his bed and

---

[1] D.D. testified as a prosecution witness. At the time of trial, she was 15 years old.

then touched her chest (i.e., breast) over and then under her clothing. She tried to move away from him several times but he "pulled [her] back down." When she told him to stop, he said, "I just want to play with your chest for a little bit." The touching stopped when defendant heard one of D.D.'s brothers approaching the bedroom.

Following this incident, defendant molested D.D. in a similar way approximately 10 times. The touching occurred every other weekend (including Christmas morning) at the family home while D.D.'s brothers were staying at their mother's house. During these incidents, there were times when defendant also touched D.D.'s "below area" under her clothes or after pulling her pants down.

The last incident alleged occurred in late April 2017 when D.D. was 13 years old. Defendant pulled D.D. onto her back while she was watching television on his bed, pulled her pants down, and lifted her shirt up. She attempted to resist him by pulling her pants up a "couple of times," pushing her shirt down, attempting to keep her bra on, trying to move away from him, "getting [her] dogs to jump on the bed," and closing her legs, but he overpowered her; he eventually pulled her pants down, took off her underwear and bra, and spread her legs apart. Shortly thereafter, she felt his erect penis touch her right thigh and then the outside of her genitals more than once. She tried to put her pants back on while he was touching her with his penis but was unsuccessful. When he touched her breasts under her clothes, she tried to get away from him but he "kept getting a grip on [her]" and "making [her] stay." Over the course of this incident, she repeatedly told him, "no," and pleaded with him to stop but he refused. Defendant stopped three to four minutes later. According to D.D., he stopped because she kept telling him "no" and to "stop," and because it was time for them to meet others for dinner.

After each incident of molestation, defendant told D.D. to promise him that she would not disclose the molestation.

In early May 2017, D.D. reported the molestation to several people, including a counselor at her school. Later that same day, D.D. met with a detective and disclosed the molestation.

D.D. later made a pretext phone call to defendant that was recorded and played for the jury. During the call, defendant made numerous incriminating statements, including repeatedly telling D.D. not to tell anybody about what had happened between them, and repeatedly promising her that "it" will never happen again. He apologized to her multiple times and promised to give her whatever she wanted if she did not disclose what had happened, and indicated that, if she did, he would be arrested and go to jail, she would be taken away from him, and he would never see her again. He also promised that they would have a "father daughter relationship" going forward and he would attend counseling. When she indicated that she was scared of becoming pregnant, he said, "No, you will not get pregnant from me just doing that." He later explained, "[Y]ou can't get pregnant from just rubbing like that, okay?" He told her, "It actually has to go inside," and reassured her that "[i]t didn't go in." When she said she was "confused" because he had pulled her pants down, he did not deny that he had done so. Instead, he repeatedly asked her if she was around people and begged her to come home.

Defendant testified on his own behalf at trial. He denied D.D.'s claims. As for the alleged incident of molestation that occurred on election night in November 2016, defendant claimed that he fell asleep in his bedroom and was woken up by D.D. elbowing him in the stomach. According to defendant, D.D. told him that he had wrapped his arms around her.

When defendant was asked about his remarks during the pretext phone call, he indicated that he believed D.D. was talking about the November 2016 incident. When he was specifically asked what he meant when he told D.D. she could not get pregnant from "rubbing like that," he explained that he was "grinding on" D.D. before he woke up. He "guessed" that he was referring to D.D.'s vagina when he said, "[I]t has to go inside." He

4

claimed that he did not deny pulling D.D.'s pants down during the pretext call because he was having "extreme difficulties" hearing her.

In rebuttal, the detective that participated in the pretext phone call testified that she spoke with defendant "[a]lmost immediately" thereafter on the phone and he brought up the fact that D.D. had accused him of pulling her pants down (suggesting he had heard D.D. say it). During the recorded phone call with the detective, selected portions of which were played for the jury, defendant discussed the 2016 election night incident. He admitted that he touched D.D.'s breast. He explained, "[D.D] laid down on my bed and I was asleep and everything. All I did was just reach up and grab." Shortly thereafter, he said, "I did grind on . . . her" and then she elbowed me and said, " 'Dad, dad,' " and then he woke up. He also told the detective that there were a few instances where he had accidentally hit D.D's breast while they were "playfighting."

## DISCUSSION

### I

*Admission of Uncharged Acts of Sexual Misconduct*

Defendant contends the trial court prejudicially erred in admitting evidence of uncharged acts of sexual misconduct under Evidence Code sections 1101 and 1108.[2] We disagree.

A. *Additional Background*

The prosecution filed a pretrial motion requesting permission to introduce evidence of uncharged acts of sexual misconduct committed by defendant under sections 1101, subdivision (b) and 1108, subdivision (a). As relevant here, the prosecution proffered evidence of two alleged sexual assaults by defendant. The first incident occurred in July 2001 when defendant was 17 years old. After a high school football

---

[2] Undesignated statutory references are to the Evidence Code.

5

game, defendant and others were riding home in a van when defendant began hitting a male (A.D.), threatening him, and calling him names for 10 to 15 minutes. Defendant repeatedly told A.D. to "suck [his] dick." At one point, defendant grabbed A.D.'s head and forced it into his crotch area. After A.D. said "no," defendant pulled his penis out and told A.D. to "[s]uck it or I'll hit you." Thereafter, defendant forced A.D.'s head near his crotch and touched A.D.'s face with his penis. A female witness heard defendant say, "I put my dick on the side of his face!" A male witness told A.D. to stand up for himself, but A.D. refused, saying that he was afraid defendant would "beat him up." Following this incident, defendant admitted to a police officer that he had grabbed A.D.'s head and pulled it toward his crotch, but claimed that he did not pull his penis out of his pants and did not remember telling other students he had touched A.D. with his penis. After juvenile proceedings were initiated, defendant admitted to annoying or molesting a child under the age of 18 in violation of Penal Code section 647.6.[3]

The second incident occurred in December 2010 when defendant was 26 years old. J.D. was 16 years old and lived next door to defendant; she often played with his children. One day when she was at his apartment, he touched her left breast two times while they were "playfighting." She believed the touching was intentional and reported it to her mother. When defendant spoke with a police officer about the incident, he denied touching J.D.'s breast; he said that they were play fighting and that he elbowed her in the arms a few times and she told him to stop.

The prosecution argued that evidence of the acts of sexual misconduct (one charged and one uncharged) was admissible propensity evidence under section 1108, subdivision (a). The prosecution further argued that evidence of the incident involving J.D. was admissible under section 1101, subdivision (b) to show intent, common plan,

---

[3] The parties stipulated to this admission at trial.

and lack of mistake.  In support of its motion, the prosecution noted that defendant, following D.D.'s disclosure of abuse, admitted to a detective that he had touched D.D.'s breasts over her clothes and "grinded" on her on one occasion, and that there were occasions when he had "accidentally smack[ed] [D.D.'s] breasts" while they were "playfight[ing]."

The defense filed its own pretrial motions, which collectively asked the trial court to exclude the uncharged sexual misconduct evidence proffered by the prosecution.

The trial court ultimately granted the prosecution's request to admit the evidence proffered by the prosecution related to J.D. under sections 1101 and 1108.  The court also granted the prosecution's request to admit the proffered evidence related to A.D. under section 1108.  In so ruling, the trial court determined that the evidence was admissible under section 352.

B.  *Applicable Legal Principles*

California law generally prohibits the introduction of character evidence to prove a defendant's propensity to commit conduct on a specific occasion.  (§ 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)  Specifically, section 1101, subdivision (a) instructs that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  Section 1108 is an exception to the general rule against the use of propensity evidence stated in section 1101.  It provides:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  (§ 1108, subd. (a).)  Section 1108 thus permits the admission of evidence that the defendant in a sexual offense prosecution "committed other sexual offenses to prove his propensity to commit the charged sexual offenses."  (*People v. Cottone* (2013) 57 Cal.4th 269, 281.)  Evidence

7

of this type is uniquely probative in sex crimes prosecutions and policy considerations outweigh the general prohibition against propensity evidence.  (*Id*. at pp. 285-286; *Falsetta, supra*, 21 Cal.4th at p. 911 [" 'The Legislature has determined the need for this evidence is "critical" [in criminal sexual offense cases] given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial' "].)  "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters."  (*People v. Cordova* (2015) 62 Cal.4th 104, 132 (*Cordova*).)

"To determine whether section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under section 352. [Citation.]  'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense,[4] its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' "  (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823-824, fn. added.)

---

**4** "Admissibility under . . . section 1108 does not require that the sex offenses be similar; it is enough the charged offense and the prior crimes are sex offenses as defined by the statute."  (*People v. Jones* (2012) 54 Cal.4th 1, 50; see *People v. Loy* (2011) 52 Cal.4th 46, 63 [" '[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under . . . section 1101, otherwise . . . section 1108 would serve no purpose.  It is enough the charged and uncharged offenses are sex offenses as defined in section 1108' "].)

8

Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' [Citation.] [¶] The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.)

We review the trial court's evidentiary ruling under sections 1101 and 1108 for abuse of discretion. (*Cordova, supra*, 62 Cal.4th at p. 132; *People v. Davis* (2009) 46 Cal.4th 539, 602.) Where, as here, the evidence was admitted under both sections 1101 and 1108, we will find error in its admission only if the evidence was inadmissible under both sections. (*People v. Branch* (2001) 91 Cal.App.4th 274, 280-281.) In other words, if the uncharged sexual misconduct evidence is admissible under section 1108, we need not consider whether the evidence is also admissible under section 1101. (See *People v. Erskine* (2019) 7 Cal.5th 279, 296 [where evidence is admissible under § 1108, it is not necessary to assess whether the evidence is also admissible under § 1101].) As we explain, here we only need consider admissibility under section 1108.

C. *Analysis*

At the outset, we reject defendant's contention that section 1108 is facially invalid because it violates a defendant's constitutional right to due process of law and a fair trial. In making this argument, defendant acknowledges that our Supreme Court has held that the statute does not violate due process principles. (*Falsetta, supra*, 21 Cal.4th at pp. 907, 915-922; see also *People v. Rhoades* (2019) 8 Cal.5th 393, 415 [rejecting contention that § 1108 violated defendant's due process and fair trial rights]; *People v. Molano* (2019) 7 Cal.5th 620, 664 [noting that the court has repeatedly declined to reconsider its holding in *Falsetta*].) He raises the due process argument here to preserve the issue for further review. Because we are bound by decisions issued by our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), no further discussion of this issue is required.

We also reject defendant's contention that reversal is required because allowing the prosecutor to introduce propensity evidence under section 1108, in combination with instructing the jury with CALCRIM No. 1191A, rendered the trial fundamentally unfair by "authorizing a propensity-based inference of guilt" in violation of " ' the underlying premise of our criminal justice system, that the defendant must be tried for what he did, not who he is.' " According to defendant, the CALCRIM No. 1191A instruction, which told the jury that it could conclude that he " 'was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that [he] was likely to commit and did commit the crime of lewd or lascivious act . . . as charged here," rendered the trial fundamentally unfair by inviting the jury to convict him on the basis that he was a sex offender rather than by relying on the evidence.

Preliminarily, we note that defendant's evidentiary claim is forfeited for failure to object on the same ground in the trial court. (*People v. McKinnon* (2011) 52 Cal.4th 610, 674.) In any event, we find no merit in defendant's argument. As a panel of this court explained in *People v. Phea* (2018) 29 Cal.App.5th 583, CALCRIM No. 1191A is a

10

correct statement of the law and to apply the preponderance standard to evidence admitted under section 1108 does not reduce the prosecution's burden of proof as to the charged offenses. (*Phea*, at pp. 608-609 [rejecting argument that CALCRIM No. 1191A allows jurors to find a defendant guilty solely based on prior uncharged acts].)[5] Further, CALCRIM No. 1191, as modified and given here, stated that if the jury found *beyond a reasonable doubt*[6] that defendant committed the uncharged sexual offenses, it could, but was not required to, conclude that he was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that it was likely he committed the charged sexual offenses, but that conclusion was "only one factor to consider along with all the other evidence" and was "not sufficient by itself" to prove the charged offenses: "The People must still prove each charge beyond a reasonable doubt." The jury also was instructed that the People had the burden to prove that defendant was guilty beyond a reasonable doubt, and that whenever the instructions indicated that the People must prove something, it meant they must prove it beyond a reasonable doubt, unless the instruction says otherwise. (CALCRIM No. 220.) We presume the jury understood and followed these instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) We disagree that admission of the disputed evidence rendered the trial fundamentally unfair.

---

[5] "In March 2017, CALCRIM No. 1191 was modified to distinguish uncharged offenses offered as propensity evidence from charged offenses offered for that purpose. CALCRIM No. 1191A now applies to the former, while CALCRIM No. 1191B applies to the latter." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn. 1.)

[6] The parties agreed to modify the pattern CALCRIM No. 1191A instruction to replace the preponderance standard of proof with the beyond a reasonable doubt standard of proof. (See CALCRIM No. 1191A.) The trial court noted that the parties' agreement avoided any potential for confusion resulting from instructing the jury with different standards of proof and reduced any prejudicial effect from the admission of the uncharged sexual misconduct evidence.

11

Next, we conclude that, contrary to defendant's contention, the uncharged incident of sexual misconduct involving J.D. qualifies as a "sexual offense" for purposes of section 1108.[7] Section 1108, subdivision (a) provides that only evidence of the commission of a qualifying "sexual offense" may be admitted under that section. Section 1108, subdivision (d) defines "sexual offense" in part as any "sexual battery" or attempted sexual battery as defined by Penal Code section 243.4. Penal Code section 243.4, subdivision (e)(1) provides that a person commits "sexual battery" in if the person "touches an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." "Touches" is defined as "physical contact with another person, whether accomplished directly, through the clothing of the person committing the offense, or through the clothing of the victim." (*Id*., subd (e)(2).) "Intimate part" is defined as "the sexual organ, anus, groin, or buttocks of any person, and the breast of a female." (*Id*., subd. (g)(1).) Here, the prosecutor's offer of proof included an allegation that defendant intentionally touched J.D.'s breast two times while they were "playfighting." This conduct constitutes evidence of defendant's commission of a sexual battery under Penal Code section 243.4, subdivision (e). We find no merit in defendant's contention that evidence related to the incident involving J.D. was not admissible, as a matter of law, under section 1108 because he was not *convicted* of a sex offense specified in the statute. The plain text of the statute imposes no such requirement. (§ 1108, subd. (a).)

---

[7] At trial, J.D. briefly testified about another incident of touching involving defendant that occurred a week before the "playfighting" incident. In that incident, defendant rubbed food all over J.D.'s breast area during a food fight involving J.D. and other children. Defendant did not object at trial when J.D. testified about the food fight incident. As such, he has forfeited any challenge to the admission of this evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 756.)

Lastly, we reject defendant's contention that the trial court abused its discretion by refusing to exclude the evidence of his uncharged sexual misconduct under section 352. The record reflects that the court considered the relevant factors in admitting the evidence, and defendant has not shown an abuse of discretion. Defendant does not identity all the relevant factors and then discuss why each instance of uncharged sexual misconduct should have been excluded based on those factors. Instead, he argues that the evidence as to both incidents should have been excluded because the incidents were insufficiently similar to the conduct giving rise to the current offenses, and because the evidence was "unwarrantedly prejudicial," as it unfairly biased the jury against him by making him out to be a serial offender. As for the incident involving J.D., defendant further argues that the absence of evidence of a conviction was prejudicial because "the jury may very well have felt [he] got away with something and deserved to be punished for that uncharged conduct, and . . . convict[ed] him of the current charge on that basis rather than being convinced beyond a reasonable doubt of his guilt of the charges involving [D.D.]." As for incident involving A.D., defendant insists, without elaboration, that "[t]he remoteness of that prior offense mandated its exclusion."

We begin our analysis by noting several considerations that guide our review of the trial court's evidentiary rulings. Evidence of a defendant's prior sexual misconduct is presumed admissible (*Cordova, supra,* 62 Cal.4th at p. 132), and is highly relevant to show his propensity for committing sex crimes. "[A] 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' [Citation.] Indeed, the reason for excluding evidence of prior sexual offenses in such cases is not because the evidence lacks probative value; rather, it is because ' "it has too much." [Citation.]' " (*People v. Branch, supra*, 91 Cal.App.4th at pp. 282-283.) Where, as here, a defendant is on trial for a sexual offense, evidence of an uncharged sexual offense "is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters."

13

(*Cordova*, *supra*, 62 Cal.4th at p. 132.) For the reasons that follow, we conclude defendant has failed to show that this standard has been met.

With respect to A.D., while this incident occurred 15 years before the conduct giving rise to the current offenses and was dissimilar to the current offenses in many respects, these circumstances do not compel exclusion. (See *Cordova, supra*, 62 Cal.4th at p. 133 [concluding that prior offenses 13 and 18 years apart from the charge crime were admissible, and that "dissimilarity alone does not compel exclusion"]; *People v. Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 825 ["evidence of even extremely dissimilar offenses may be admitted under section 1108"].) The incident involving A.D. occurred in 2001, the incident involving J.D. occurred in 2010, and the charged offenses involving D.D. occurred in 2016 and 2017. The incident of sexual misconduct in 2010 narrowed the gap between defendant's incidents of sexual misconduct and showed a pattern of misbehavior. Moreover, defendant's conduct in the incident involving A.D. was not entirely dissimilar to the conduct giving rise to the current offenses; in both instances he exploited the vulnerability of his victims. He used force to overcome the physical and verbal resistance of a weaker victim. As for the other relevant factors, admission of defendant's offense against A.D. did not risk confusing the issues or distracting the jurors from deciding the issues in this case. The risk of distraction was minimized here because the jury knew defendant had already been adjudicated of committing a sexual offense against A.D. and thus "would not be tempted to . . . punish him for the [prior offense]." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) In addition, evidence of the offense against A.D. and the offenses against D.D. "each came from independent sources," which further minimized any risk of distraction or confusion. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1106.) So, too, did the jury instructions, including the instructions on reasonable doubt (CALCRIM No. 220), the consideration and use of evidence of uncharged sexual offenses (CALCRIM No. 1191A), and the prosecution's burden of proving each element of the charged crimes (CALCRIM Nos.

1110, 1111). Finally, evidence of the incident involving A.D. included the brief testimony of two eyewitnesses, which reduced the risk of confusing the jury by conducting a trial within a trial, and that incident was not more inflammatory than the conduct giving rise to the current charges. Nothing in the record suggests that the incident involving A.D. would have inflamed the jury to convict based on that incident rather than the evidence supporting the current offenses. (See *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 [noting that a factor affecting the prejudicial effect of uncharged acts includes " 'whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses' "].)

With respect to J.D., the evidence was particularly probative because it showed that defendant had previously claimed he was just "playfighting" in response to an accusation of inappropriately touching a minor's breast. Thus, while the uncharged misconduct itself was not similar to the current offenses in where and how it occurred, its probative value was nonetheless substantial. Further, the incident was not remote in time and not more inflammatory than the conduct giving rise to the charged offenses. While the uncharged misconduct was never prosecuted, nothing in the record suggests the jury was confused or attempted to punish defendant for that misconduct. Evidence of the incident was limited to the testimony of a single witness (J.D.), which reduced the risk of confusing the jury. Moreover, any risk of confusion and distraction was further minimized by the fact that evidence of the uncharged misconduct and current offenses came from different sources and by the jury instructions given.

In sum, we conclude defendant has failed to demonstrate that the trial court abused its discretion in admitting evidence of other sexual misconduct under section 1108.

## II

### *Alleged Sentencing Error*

Defendant contends the trial court erred in determining he was subject to mandatory consecutive sentences on counts five and six under subdivision (d) of Penal

15

Code section 667.6.  According to defendant, reversal is required because the evidence adduced at trial does not support the trial court's finding that the crimes occurred on separate occasions within the meaning of the statute.  We disagree.

A.  *Additional Background*

The information charged defendant in counts five and six with committing an aggravated lewd and lascivious act on D.D. on April 29, 2017.  The specific unlawful act alleged in count five was defendant rubbing his penis against D.D.'s body, while the specific unlawful act in count six was defendant rubbing D.D.'s chest "skin to skin."  As detailed *ante*, the evidence adduced at trial showed that defendant used force to accomplish the molestation that occurred in April 2017, which included defendant touching D.D.'s breasts under her clothes and touching her thigh and vagina with his erect penis.  During this incident, D.D. repeatedly attempted to resist defendant but was unsuccessful.

At sentencing, defense counsel requested the trial court impose a 10-year sentence, comprised of the low-term of five years on counts five and six and concurrent sentences on the remaining counts.  In doing so, defense counsel stated that "mandatory consecutive sentencing" on counts five and six was required as a matter of law.  The prosecutor asked the trial court to impose an upper-term sentence of 34 years, as recommended by the probation officer, including consecutive sentences on counts five and six (which the probation officer characterized as "mandatory."

The trial court sentenced defendant to an aggregate term of 28 years in prison, which included consecutive six-year sentences on counts five and six under Penal Code section 667.6, subdivision (d).[8]  In concluding that mandatory consecutive sentences

---

[8]  At sentencing, the trial court referenced Penal Code section 667.6, subdivision (b), but the record makes clear that the court misspoke and meant to reference Penal Code section 667.6, subdivision (d).

16

were required on these counts, the trial found that the conduct giving rise to these offenses occurred on separate occasions as defendant had a reasonable opportunity to reflect upon his actions between his crimes but decided to "resume the sexually assaultive behavior." The court explained, "The force that was used at different times when different touchings occurred, there was ample time [for defendant] to reasonably reflect on [his] actions and stop the behavior, especially in light of [D.D.'s] resistance and continuing to say no and trying to keep her pants pulled up."

B. *Applicable Legal Principles*

Penal Code section 667.6, subdivision (d) provides, in relevant part: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e)[9] if the crimes involve separate victims or involve the same victim on separate occasions. [¶] In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (Fn. added.)

When, as here, "a trial judge has found under [Pen. Code] section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a

---

**9** Subdivision (e) of section 667.6 lists Penal Code section 288, subdivision (b) as crime for which consecutive sentences are mandatory if the crime is committed against a single victim on separate occasions.

reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

"[A] finding of 'separate occasions' under Penal Code section 667.6 does not require a change in location or an obvious break in the perpetrator's behavior: '[A] forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter.' " (*People v. Jones* (2001) 25 Cal.4th 98, 104, superseded by statute on other grounds as stated in *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1307; see also *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071 ["at sentencing a trial court could find a defendant had a 'reasonable opportunity to reflect upon his or her actions' even though the parties never changed physical locations and the parties 'merely' changed positions"].)[10] For example, in *People v. Garza*, *supra*, 107 Cal.App.4th 1081, a panel of this court determined that the trial court could reasonably have concluded three forcible sex offenses occurred on "separate occasions" even though each was committed against the victim while in a parked car during the span

---

[10] In *People v. Solis* (2012) 206 Cal.App.4th 1210, 1220, a panel of this court considered and rejected a challenge to Penal Code section 667.6, subdivision (d), on the ground it was unconstitutionally vague. Although the *Solis* court was not considering a challenge to the trial court's sentencing discretion, it considered various cases and disagreed with the defendant's argument that the decisions were inconsistent and left perpetrators to guess at the meaning of "separate occasions" under the statute. (*Solis*, at p. 1219.) The court explained, "It takes no particular depth of reasoning to be able to distinguish between a situation where a perpetrator engages in a continuous course of conduct involving multiple sex offenses with no break in between and one in which the individual offenses are separated by some other activity, either of the defendant or another, that interrupts the assault and affords the perpetrator an opportunity to reflect on what he or she is doing. The activity need not involve any type of movement of the victim and need not be of any particular duration. It may be nothing more than car lights going by that cause the perpetrator to pause and reflect before proceeding. . . or some activity not amounting to a sex offense, like pausing to listen to the victim's answering machine or punching the wall . . . . We believe a perpetrator can reasonably be held to recognize this distinction." (*Id*. at p. 1220.)

18

of several minutes. (*Id.* at p. 1092.) The *Garza* court explained: "After defendant forced the victim to orally copulate him, he let go of her neck, ordered her to strip, punched her in the eye, put his gun to her head and threatened to shoot her, and stripped along with her. That sequence of events afforded him ample opportunity to reflect on his actions and stop his sexual assault, but he nevertheless resumed it. Thus, defendant's first act of rape was committed on a separate occasion from the forcible oral copulations. [Citation.] [¶] Similarly, defendant had an adequate opportunity to reflect upon his actions between the time he inserted his finger in the victim's vagina and the commission of the first rape. During this interval, defendant (1) began to play with the victim's chest[,] (2) put his gun on the back seat[,] (3) pulled the victim's legs around his shoulders and, finally, (4) forced his penis inside her vagina. A reasonable trier of fact could have found the defendant had adequate opportunity for reflection between these sex acts and that the acts therefore occurred on separate occasions for purposes of application of section 667.6, subdivision (d)." (*Id.* at pp. 1092-1093.) In so concluding, the *Garza* court cited *People v. Plaza* (1995) 41 Cal.App.4th 377, in which the appellate court affirmed the trial court's finding that five sexual assaults occurred on "separate occasions" even though all of the acts took place in the victim's apartment; the court explained that while the defendant's physical assault never ended, there were sufficient breaks in his "assaultive *sexual* behavior" (e.g., pausing to listen to the victim's answering machine and punching a wall) to support the trial court's finding. (*Id.* at pp. 384-385; see *People v. King* (2010) 183 Cal.App.4th 1281, 1325-1326 [affirming finding that sexual assaults occurred on "separate occasions" where police officer sexually assaulted the victim on the side of the road, "momentarily paused to look around uneasily" when a car drove by, and then resumed his sexual assault by committing a "separate assaultive act"].)

In *People v. Pena* (1992) 7 Cal.App.4th 1294, 1316, however, the appellate court held it was error to impose full-term consecutive sentences pursuant to Penal Code section 667.6 because the sexually assaultive behavior was continuous where the

defendant raped the victim, "flipped the victim over," and orally copulated her. The appellate court in *People v. Corona* (1988) 206 Cal.App.3d 13 came to a similar conclusion. There, the defendant kissed the victim, removed her pants, kissed her again, put his finger into her vagina, kissed her genitals, raped her, stopped, got out of the car, returned five minutes later, and raped her again. (*Id*. at p. 15.) Though the *Corona* court upheld consecutive sentences for the two rapes, it held it was error to impose consecutive sentences for the sex crimes preceding the first rape because "there was no cessation of sexually assaultive behavior" to afford the defendant "a reasonable opportunity for reflection." (*Id*. at pp. 17-18.)

C. *Analysis*

We begin our analysis by concluding that defendant did not forfeit his claim of sentencing error by failing to object to consecutive sentences at sentencing. Defendant's argument raises a claim of unauthorized sentence that is reviewable in the absence of an objection in the trial court. (*People v. Maharaj* (2012) 204 Cal.App.4th 641, 648.) Accordingly, we consider the issue on the merits.

On this record, we conclude that a reasonable trier of fact could have concluded that defendant had a reasonable opportunity to reflect on his actions between the commission of one sex crime and another. Although the record is not clear as to whether defendant grabbed D.D.'s breasts before and/or after he pulled her pants down and touched her thigh and vagina with his erect penis, the record shows that D.D. resisted defendant, both verbally and physically, throughout the entire incident of molestation that occurred in April 2017, including demanding that he stop multiple times, repeatedly telling him "no," repeatedly pulling her pants up after he pulled them down, and trying to move away from him while he was grabbing her breasts. The record further shows that defendant ignored D.D.'s efforts to resist him, physically controlled her, and then continued to sexually assault her. Under these circumstances, we reject defendant's claim that the trial court abused its discretion in finding that he sexually assaulted D.D.

on separate occasions within the meaning of Penal Code section 667.6, subdivision (d). D.D.'s resistance afforded defendant ample opportunity to reflect on his conduct and stop his sexual assault, but he nevertheless continued to sexually assault her. Accordingly, we find no sentencing error.

## III

### *Cumulative Error*

Defendant contends the cumulative effect of multiple trial court errors violated his constitutional rights and warrants reversal. In addition to the asserted evidentiary error we have discussed *ante*, defendant argues that several other errors (raised for the first time within his argument for cumulative error), when considered together, require a new trial. The additional asserted errors include: (1) the admission of evidence showing D.D. was having suicidal thoughts in violation of a pretrial order;[11] (2) the trial court's exclusion of evidence related to child molestation committed by D.D.'s uncle (which defendant argued was relevant because D.D. was aware of her uncle's case); and (3) the trial court's failure to grant a new trial based on the discovery of Instagram posts made after trial indicating D.D. had lied about the molestation. We find no basis for reversal on this theory.

---

[11] A recording of D.D.'s SAFE interview was played for the jury. At one point during the interview, D.D. mentioned that one of her brothers was aware she was having suicidal thoughts. After the jury heard the SAFE interview, the defense moved for a mistrial on the basis that the admission of the evidence was prejudicial and violated a pretrial order. In a discussion outside the presence of the jury, the trial court denied defendant's motion, finding that any prejudice from the admission of the evidence could be cured by admonishing jurors not to consider the evidence and instructing the jurors not to consider sympathy for the alleged victim in reaching their verdicts. After consulting with defendant, defense counsel declined the trial court's offer to admonish the jury, deciding it was tactically unwise to draw attention to the issue. The parties agreed that the jury should be provided a redacted version of the SAFE interview and a redacted transcript.

" '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  Reversal may be required when the cumulative effect of serious trial errors made at trial amounted to a miscarriage of justice.  (See *People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)  A judgment will not be reversed "absent a clear showing of a miscarriage of justice."  (*Hill,* at p. 844.)

We have rejected, on the merits, the primary claim of trial error defendant has raised on appeal,[12] and defendant has not shown that the additional errors he has identified in support of his cumulative error theory require reversal based on their cumulative prejudicial impact.  Defendant's insufficiently developed arguments do not demonstrate error, let alone a series of serious trial errors that resulted in a miscarriage of justice.[13]  (See *Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984-985 [an appellate court's role is to evaluate legal arguments supported by citation to authorities; appellate courts are not required to examine undeveloped claims or make arguments for the parties].)  In the absence of established errors to accumulate, we must reject

---

[12]  We have also rejected, on the merits, defendant's claim of sentencing error. Defendant mentions this claim in support of his cumulative error theory but has failed to show how sentencing error is relevant to the cumulative error analysis.

[13]  Defendant has failed to show how the denial of his motion for new trial based on newly-discovered evidence is relevant to a cumulative error analysis.  Nor has he raised a separate claim arguing that reversal is required due to the trial court's erroneous denial of his motion for new trial.  Instead, he states, "While the issue regarding the Instagram posts alone may not warrant relief, when coupled with all the other errors, it casts grave doubt on the reliability of the verdicts.  The Instagram posts ' . . . raise[ ] the spectre of fundamental unfairness such as to violate federal due process of law.' "

defendant's contention. (See *People v. Salcido* (2008) 44 Cal.4th 93, 156 [rejecting cumulative error claim for guilt phase of capital trial, because the defendant had not established error]; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068 ["There can be no cumulative error if the challenged rulings were not erroneous."].)

IV

*Confidential Records*

Defendant asks us to independently review subpoenaed confidential records pertaining to D.D., reviewed by the trial court in camera, to determine whether that court erred in concluding that the records were not discoverable by the defense. Defendant further asks us to review his confidential juvenile records, which were submitted to the trial court under seal by the People in connection with sentencing, to determine whether the records contain any relevant, probative evidence that might be helpful to the defense on appeal. The People do not oppose the former request but argue that the latter request should be denied. As we shall explain, we conclude that the trial court did not err in refusing to disclose confidential records pertaining to D.D., and that review of defendant's juvenile court records is unnecessary because we have no authority to release such records under the circumstances of this case.

A. *D.D.'s Confidential Records*

Under the procedure set forth in Penal Code section 1326, when, as here, a criminal defendant has subpoenaed confidential records of a nonparty, "the court may order an in camera hearing to determine whether or not the defense is entitled to receive the documents." (*Id.*, § 1326, subd. (c).) Upon request, an appellate court's role is to review the confidential records that were not disclosed by the trial court "to determine whether they were material and should have been disclosed." (*People v. Martinez* (2009) 47 Cal.4th 399, 453.) " ' "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine

23

confidence in the outcome." ' [Citations.] We also consider the effect of nondisclosure on the investigations conducted by counsel and on counsel's trial strategy." (*Id*. at pp. 453-454.)

Having reviewed the subpoenaed confidential records pertaining to D.D., we conclude that the undisclosed records do not contain any evidence material to the defense. Therefore, we find no error in the trial court's decision not to disclose them.

B. *Defendant's Confidential Juvenile Court Records*

Prior to filing an opening brief on appeal, defense counsel filed a motion asking us to provide him with a copy of certain sealed portions of the record, including defendant's confidential juvenile court records, to determine whether the records contain any documents "relevant to a possible issue on appeal." We issued an order denying (in part) the motion "without prejudice to a showing that these documents were provided to [defendant's] trial counsel." In his opening brief, defendant did not make such a showing. Instead, he asks us to "review [his] juvenile records to determine whether they contain any relevant, probative evidence." In response, the People assert that we need not review defendant's juvenile court records because defense counsel may inspect the records without a court order and without first obtaining our independent review. In reply, defendant claims that his counsel cannot inspect the records because we denied his motion to obtain a copy of them. We disagree.

"[J]uvenile court records are generally confidential, 'but not absolutely so.' " (*In re J.C.* (2017) 13 Cal.App.5th 1201, 1212.) Welfare and Institutions Code section 827, subdivision (a) lists the persons who may inspect juvenile court records without a court order, including "[t]he attorneys for the parties . . . who are actively participating in criminal . . . proceedings involving the minor." (*Id.*, subd. (a)(1)(E).) These individuals may also receive a copy of the case file. (*Id.*, subd. (a)(5).) "The juvenile court has exclusive authority to determine the extent to which confidential juvenile records may be released and controls 'the time, place and manner of inspection.' " (*In re Gina S.* (2005)

133 Cal.App.4th 1074, 1081-1082; see also *In re Keisha T.* (1995) 38 Cal.App.4th 220, 232-233.)  The juvenile court cannot delegate its responsibility to another court, as it alone has " 'the sensitivity and expertise' " to make this determination.  (*In re Keisha T.*, at p. 232; see *In re Anthony H.* (2005) 129 Cal.App.4th, 495, 502 [juvenile court erred in delegating to federal court judge determination whether juvenile court records would be released].)

> We decline defendant's invitation to review his juvenile court records in the first instance to determine whether they contain any relevant information that should be disclosed to the defense.  The juvenile court has *exclusive* authority to determine the extent to which confidential juvenile records may be disclosed.  (*In re Gina S.*, *supra*, 133 Cal.App.4th at p. 1081; see *People v. Martinez*, *supra*, 47 Cal.4th at p. 453 [an appellate court's function is to review the confidential records that the juvenile court declined to disclose, in order to determine whether the records were material and should have been disclosed].)

## V

### *Assembly Bill No. 1869*

In a supplemental brief, defendant argues that the recent passage of Assembly Bill No. 1869 requires us to vacate certain fees imposed at sentencing; specifically, the booking fee (Gov. Code, § 29550.2, subd. (a)), main jail classification fee (see *ibid.*), and presentence report fee (*id.,* § 1203.1b).  According to defendant, he is entitled to such relief because Assembly Bill No. 1869 makes ameliorative changes to the law that apply retroactively to all cases, including cases, like his, not yet final on appeal.  As we shall explain, we agree and shall modify the judgment to strike the fees.

Assembly Bill No. 1869 was signed into law in September 2020 and became operative on July 1, 2021.  The bill repeals the authority to collect various fees contingent upon a criminal arrest, prosecution, or conviction for the cost of administering the criminal justice system.  (See Stats. 2020, ch. 92, §§ 11, 62)  The bill makes the unpaid

25

balance of these court-imposed costs, including the fees at issue in this case, unenforceable and uncollectible, and requires that any portion of a judgment imposing such costs be vacated.  (See *ibid.*; Pen. Code, § 1465.9, subds. (a), (b) [operative July 1, 2021]; Gov. Code, § 6111, subds. (a), (b) [same].)  The stated intent of the bill is to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and . . . all outstanding debt incurred as a result of the imposition of administrative fees."  (Stats. 2020, ch. 92, § 2.)

Under the rule announced in *In re Estrada* (1965) 63 Cal.2d 740, absent contrary evidence (e.g., express savings clause providing only prospective relief), we presume that ameliorative changes to the criminal law apply retroactively to all nonfinal judgments of conviction.  (*Id.* at pp. 745, 747-748; *People v. Stamps* (2020) 9 Cal.5th 685, 699.)

We conclude that Assembly Bill No. 1869 applies retroactively to all cases that are not yet final when it takes effect.  Nothing in the bill suggests the Legislature intended that the changes in law apply prospectively only.  Accordingly, under the *Estrada* rule, it is appropriate to infer that the Legislature intended that the bill apply to all cases not yet final when the bill takes effect on July 1, 2021.  (See *In re Estrada, supra*, 63 Cal.2d at pp. 744-745; *People v. Conley* (2016) 63 Cal.4th 646, 657 ["[I]n the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not"].)

We reject the People's suggestion that defendant's claim is not ripe for adjudication.  Under *Estrada*, Assembly Bill No. 1869's ameliorative changes to the law apply to defendant so long as his conviction is not final before July 1, 2021, the date the changes take effect.  For retroactivity purposes, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.  (*People v. Vieira* (2005) 35 Cal.4th 264, 306.)  Given that defendant's judgment will not be final before the effective date of Assembly Bill No. 1869, the ameliorative changes in

26

the law will apply to this case.[14]  (See *People v. Lopez* (2019) 42 Cal.App.5th 337, 342 [applying, in a Nov. 20, 2019-filed opinion, ameliorative amendments that became effective on Jan. 1, 2020, to a defendant because "[i]t is clear that [defendant] will not exhaust his appeal rights before January 1, 2020.  As such, he benefits from [the amendments]."].)  Accordingly, we modify the judgment to strike the fees at issue therefrom; specifically, the booking fee (Gov. Code, § 29550.2, subd. (a)), main jail classification fee (see *ibid*.), and presentence report fee (Pen. Code,§ 1203.1b)  We express no opinion as to defendant's contention that Assembly Bill No. 1869 retroactively applies to all cases, including cases where the judgment of conviction has become final.  This issue is not before us.

---

[14]  A final judgment will not be rendered on appeal here until after at least 30 days following the date our opinion is filed.  (Cal. Rules of Court, rules 8.366(b)(1), 8.888(a).)  If one or more parties file a petition for rehearing, the date of finality will be extended further.  (Cal. Rules of Court, rule 8.268(b)(1)(A).)  The parties will have 10 days after this decision becomes final to petition for review in the California Supreme Court.  (Cal. Rules of Court, rule 8.500(e)(1).)  Only after a petition for review has been adjudicated in the state court of last resort, or the time for asking for review expires, can a party petition for a writ of certiorari in the United States Supreme Court, and such a petition is timely when filed "within 90 days after entry of the judgment."  (U.S. Supreme Ct. Rules, rule 13(1).)

## DISPOSITION

The judgment is modified to strike the booking fee (Gov. Code, § 29550.2, subd. (a)), main jail classification fee (see *ibid*.), and presentence report fee (Pen. Code, § 1203.1b).  As modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and provide a certified copy to the Department of Corrections and Rehabilitation.


       /s/       
Duarte, J.

We concur:


    /s/    
Murray, Acting P. J.


    /s/    
Krause, J.